UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                                                          Case No. 9:12-bk-12132-FMD
                                                                                                Chapter 7
Robert Paul Moore, Jr., and
Jennifer Rebecca Moore,

    Debtors.
_____/

Dennis and Lisa Fiandola,

    Plaintiffs,

vs.                                                                                             Adv. Pro. No. 9:12-ap-1054-FMD

Robert and Jennifer Moore,

    Defendants.
_____/

**MEMORANDUM OPINION ON PLAINTIFFS'
SECOND AMENDED COMPLAINT OBJECTING TO
DISCHARGEABILITY AND DISCHARGE PURSUANT TO 11 U.S.C. §§ 523 AND 727**

    Dennis and Lisa Fiandola ("Plaintiffs") hired Defendant Jennifer Moore's interior design company, Moore Pizazz LLC ("Moore Pizazz"), to perform interior design services for their newly constructed Naples, Florida home. When Moore Pizazz did not complete the project as agreed, Plaintiffs sued and obtained a judgment against Mrs. Moore and Moore Pizazz. Days later, Mrs. Moore and her husband, Robert Moore, ("Defendants") filed a petition for relief under Chapter 7 of the Bankruptcy Code.

Plaintiffs seek the denial of Defendants' discharge under 11 U.S.C. § 727,[1] to except their claim against Mrs. Moore from discharge under § 523(a)(2)(A), and to except their claims against both Defendants from discharge under § 523(a)(6). For the reasons set forth below, the Court finds that Plaintiffs have failed to meet their burden of proof.

## FACTS

Plaintiffs purchased a new home in Naples, Florida, from Pulte Homes, a national homebuilder. A Pulte employee referred Plaintiffs to Jennifer Moore and her interior design company, Moore Pizazz. In February 2011, Plaintiffs retained Moore Pizazz to perform interior design services, including construction and painting services, lighting, and furniture. Plaintiffs signed an engagement letter with Moore Pizazz that provided for a $1,500.00 retainer and an advance deposit of 80% of the cost of any contracted construction projects and furniture orders ("Engagement Letter"). Plaintiffs were concerned with the high amount of the 80% deposit. They asked Mrs. Moore why Moore Pizazz required such a large deposit. Mrs. Moore explained that she was unwilling to finance their contract and that Moore Pizazz operated at a low profit margin.

Over the next few months, Plaintiffs became concerned with Moore Pizzazz's performance because some of their furniture orders were incomplete when delivered. Despite these concerns, Plaintiffs made several additional deposits with Moore Pizazz for future orders. In August 2011, Plaintiffs gave Moore Pizazz a $30,000.00 deposit on an order for a custom bar and shelving; lighting in the foyer, dining room, nook, bar, and great room; window treatments in the great room and nook; rugs for the foyer and great room; and artistic faux painting in various rooms.

Prior to delivering the $30,000.00 deposit, Plaintiffs asked Mrs. Moore what would happen to their orders should something happen to her. Mrs. Moore told Plaintiffs that her father was an

---

[1] Unless otherwise stated, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. §101, *et seq.*

investor in Moore Pizazz and he would ensure their jobs were completed. Mrs. Moore also told Plaintiffs that Moore Pizazz was insured. With these assurances, Plaintiffs delivered their $30,000.00 deposit. As was her business practice, Mrs. Moore deposited the $30,000.00 check into Moore Pizazz's general operating bank account.

Around the time that Plaintiffs paid the $30,000.00 deposit, Moore Pizazz entered into a lease for a 22,000 square foot showroom, paying rent of $15,000.00 per month. Approximately two months after taking occupancy, the showroom flooded in heavy rains. Mrs. Moore learned that the showroom had suffered prior water intrusions and was contaminated with black mold. Mrs. Moore became ill as a result of her exposure to the black mold. The showroom was never opened to the public.

On November 30, 2011, Mrs. Moore sent Plaintiffs an email informing them that she was trying to relocate from the contaminated showroom and that she would try to finish their pending order as soon as possible. Mrs. Moore also had a heated conversation with Mr. Fiandola about the status of Plaintiffs' orders. Mrs. Moore emailed Plaintiffs later the same day explaining that she wanted to finish their project, but that she would "file for bankruptcy if [she had] lawyers down [her] throat."[2]

Despite Mrs. Moore's stated intention to complete Plaintiffs' project, Moore Pizazz did not finish the work or deliver the furniture it had agreed to order for Plaintiffs. Instead, Mrs. Moore filed an insurance claim for damages to the showroom and Moore Pizazz resulting from the black mold. She planned to use the insurance proceeds to refund Moore Pizazz's customers' deposits. However, Mrs. Moore learned upon filing the insurance claim that Moore Pizazz's insurance policy did not include coverage for mold claims. And contrary to what Mrs. Moore told Plaintiffs, her

---

[2] Pl.'s Ex. No. 30.

3

father was only considering making an investment in Moore Pizazz; after the discovery of the black mold and its impact on Moore Pizazz, Mrs. Moore's father decided against making the investment.

Moore Pizazz did not fulfill a portion of the orders for which Plaintiffs had made deposits. Specifically, Plaintiffs did not receive a leather couch, leather chairs, barstools, or a rug. Moore Pizazz also failed to complete certain services, including artistic faux painting, pendant lighting, and various construction projects. In order to finish their decorating projects, Plaintiffs were compelled to pay vendors themselves for the leather couch and chairs, the barstools, the artistic faux painting, pendant lighting, and construction.

In February 2012, Plaintiffs sued Mrs. Moore and Moore Pizazz in state court for breach of contract. Neither Mrs. Moore nor Moore Pizazz defended the action. On August 2, 2012, the state court entered an amended final judgment in Plaintiffs' favor and against Jennifer Moore and Moore Pizazz in the amount of $52,423.68. On August 7, 2012, Defendants filed for bankruptcy, prompted by the Lee County Sheriff's Office levy on two of Defendants' cars to satisfy a judgment lien.[3]

Meanwhile, starting in April 2012, Mr. Moore took items from Moore Pizazz's contaminated showroom and delivered them for sale to a consignment store known as Posh Plum. Mr. Moore testified that he used the sales proceeds to pay Moore Pizazz's corporate obligations, including payments necessary to complete other customers' jobs. Mrs. Moore testified that she was ill during this time period and did not know that her husband had delivered Moore Pizazz assets to Posh Plum for consignment.

In support of their § 727 claims, Plaintiffs allege that Defendants made false oaths in their bankruptcy schedules and statement of financial affairs and at their § 341 creditors' meeting because they failed to disclose that they had transferred a 1956 Ford Thunderbird and a 2003

---

[3] No evidence was presented at trial regarding the identity of the creditor holding the judgment lien or at whose behest the cars were levied upon.

4

Chevrolet HHR to third parties via Craigslist for a total of $35,000.00.[4] Plaintiffs also alleged that Defendants failed to list their interest in the potential proceeds of the settlement of a Chinese drywall class action lawsuit in their bankruptcy schedules.[5]

Mr. Moore testified that in their haste to prepare their bankruptcy petition (due to the levy upon their cars) Defendants' focus was on making full disclosure of assets owned by them and that they inadvertently forgot to disclose the sale of the Ford and Chevrolet vehicles. The transcript of the § 341 creditors' meeting reveals that Mr. Moore testified to the sales of the vehicles, albeit somewhat inartfully. On the following day, Defendants amended their Statement of Financial Affairs to reflect the sales.[6] Mr. Moore also testified that the home with the Chinese drywall problem had been foreclosed upon, and that his attorney had advised him that any right he had in the class action had been extinguished as a result of the foreclosure.

## ANALYSIS

### *Burden of Proof*

A plaintiff objecting to a debtor's discharge under § 727(a)(4)(A) for an alleged false oath or account must establish by a preponderance of the evidence that the debtor is not entitled to a discharge.[7] The same is true of a § 727(a)(5) claim.[8] Further, the denial of a debtor's discharge is an "extraordinary remedy"[9] and an "extreme penalty"[10] to the debtor. Therefore, any challenge to a debtor's discharge must be construed strictly against the objecting party and liberally in favor of the

---

[4] Doc. No. 40, ¶¶ 43, 70.
[5] *Id.*
[6] Pl.'s Ex. No. 5.
[7] *In re Khanani*, 374 B.R. 878, 888 (Bankr. M.D. Fla. 2005).
[8] *In re Moore*, 2010 WL 1880573, at *7 (Bankr. N.D. Ala. May 6, 2010) (applying a preponderance of the evidence standard).
[9] *Dorsey v. DePaola*, 2012 WL 1957713, at *11 (M.D. Ala. May 31, 2012).
[10] *In re Nascarella*, 492 B.R. 914, 917 (Bankr. M.D. Fla. 2013).

debtor.[11] Similarly, a plaintiff seeking to except a debt from discharge under §§ 523(a)(2)(A) and 523(a)(6) must prove all the essential elements of the claim by a preponderance of the evidence.[12] And, like objections to discharge, exceptions to the dischargeability of a particular debt are also strictly construed in favor of the debtor.[13]

### *Counts I and VII as to Jennifer and Robert Moore: False Oath Under § 727(a)(4)(A)*

Plaintiffs contend that Defendants' discharge should be barred because they failed (1) to disclose the two prepetition vehicle sales; (2) to include those sales proceeds in their scheduled income; (3) to list income from the sale of business assets as part of their personal income on the Means Test incorporated in Schedule B22C; and (4) to disclose their claim in a Chinese drywall class action as an asset.

Discharge should be denied under § 727(a)(4)(A) when a false oath or account was knowingly and fraudulently made and related to a material fact.[14] A false oath is material when "it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[15] However, because § 727(a)(4)(A) aims to "prevent knowing fraud or perjury," the objection should not apply to "minor errors."[16] Thus, courts analyze the omissions or nondisclosures to determine whether they were part of a scheme to retain assets for the debtor's own benefit at the expense of creditors.[17]

---

[11] *Id.*

[12] *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991) (holding that the preponderance of the evidence standard applies to all § 523(a) non-dischargeability claims); *In re Pelchat*, 2014 WL 457776, at *2 (Bankr. N.D. Ga. Jan. 7, 2014) (citing *Grogan* in a § 523(a)(2)(A) case); *In re Ragucci*, 433 B.R. 889, 895 (Bankr. M.D. Fla. 2010) (citing *Grogan* in a § 523(a)(6) case).

[13] *In re Mitchell*, 633 F.3d 1319, 1327 (11th Cir. 2011).

[14] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

[15] *Id.*

[16] *In re Dupree*, 336 B.R. 490, 494 (Bankr. M.D. Fla. 2005) ("There is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his Statement of Financial Affairs, and a debtor who, through inadvertence, mistake, or ignorance of the issue of materiality in his disclosures, may omit certain assets in his original Statement of Financial Affairs.").

[17] *Id.*

The transcript from Defendants' § 341 creditors' meeting reflects that when the Chapter 7 Trustee asked Mr. Moore about prepetition vehicle sales, he testified that he sold the two cars in January 2012.[18] Shortly thereafter, Defendants amended their statement of financial affairs to include these sales. The Court finds that Defendants' failure to disclose the car sales and the resulting proceeds was not knowing or fraudulent because the initial failure to disclose the cars sales was unintentional, they were forthcoming with corrected testimony at the § 341 creditors' meeting, and the original omissions were cured by the subsequent amendment.

Regarding Defendants' alleged failure to list income from the sale of Moore Pizazz assets on their statement of financial affairs, the evidence at trial was that Mr. Moore used the sale proceeds to pay Moore Pizazz's obligations. There was no evidence that the proceeds were retained by Defendants or used for personal purposes; thus, the proceeds are not imputed to Defendants and need not have been disclosed by them as income on their statement of financial affairs.

Lastly, as to Defendants' alleged failure to disclose their interest in the Chinese drywall class action settlement, there was no evidence that Defendants had such an interest. And even if they did, the omission was not knowing and fraudulent because Mr. Moore was advised by counsel that the claim had been extinguished because of the foreclosure of the property giving rise to the claim.

Accordingly, the Court concludes that Plaintiffs have not satisfied their burden of proof on their §727(a)(4)(A) claim.

### Count IV as to Jennifer Moore:  Failure to Explain Loss of Assets Under § 727(a)(5)

Plaintiffs contend that Mrs. Moore should be denied a discharge because she has failed to account for over $42,000.00 in deposits that Plaintiffs paid to Moore Pizazz. Under § 727(a)(5), a

---

[18] Pl.'s Ex. No. 2, p. 8.

debtor may be denied her discharge if she "has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."[19] But as contrasted with § 727(a)(7), which relates to a debtor's actions with respect to an insider who is also a debtor,[20] § 727(a)(5) concerns only assets belonging to the debtor.[21] Section 727(a)(5) does not require Mrs. Moore to explain the deficiency of Moore Pizazz's assets.

Plaintiffs have not shown that Mrs. Moore has failed to satisfactorily explain a loss of assets. Her discharge should not be denied under § 727(a)(5) of the Bankruptcy Code.

*Count II as to Jennifer Moore:  Fraud Under § 523(a)(2)(A)*

In their Second Amended Complaint, Plaintiffs contend that Mrs. Moore fraudulently obtained their deposits by misrepresenting that Moore Pizazz would use the deposits to complete their orders and that Mrs. Moore always intended to use the deposits for her own personal purposes.[22] At trial, Plaintiffs further contended that Mrs. Moore falsely represented that if she were unable to complete Plaintiffs' projects, then her father, as an investor, would be responsible for the projects' completion and that Moore Pizazz was insured.

Section 523(a)(2)(A) excepts debts from discharge to the extent they were obtained by false pretenses, a false representation, or actual fraud. In order to prevail on their claim, Plaintiffs must establish, by a preponderance of the evidence, that Mrs. Moore made a false representation with the intention of deceiving them; that Plaintiffs justifiably relied on that false representation; and that

---

[19] § 727(a)(5).
[20] § 727(a)(7) bars the discharge of a debtor who has committed any act specified in § 727(a)(2)-(6) in connection with another case under title 11, concerning an insider.
[21] *See In re Harmon*, 379 B.R. 182, 190 (Bankr. M.D. Fla. 2007) (noting that the party objecting to discharge must first prove that the debtor at one time owned the assets which are no longer available for creditors). As explained below in connection with Plaintiffs' Count III for conversion against Mrs. Moore, Plaintiffs' deposits became property of Moore Pizazz.
[22] Doc. No. 40, ¶ 28.

8

they sustained a loss as a result of the false representation.[23] In addition, the alleged misrepresentation must have occurred and been relied upon at the time that the debt was incurred, *i.e.*, when Plaintiffs made their deposits.[24]

At trial, there was no evidence that when Mrs. Moore accepted Plaintiffs' deposits, she did not intend for Moore Pizazz to complete their projects or that she diverted the deposits to her own personal use. Instead, the evidence at trial was that Moore Pizazz's failure to complete Plaintiffs' projects was the result of the impact of the black mold problem on Moore Pizazz's business operations and Mrs. Moore's health.

With respect to the alleged misrepresentations, the evidence is that at the time the representations were made, Mrs. Moore believed that her father intended to invest in the business and that Moore Pizazz did have insurance – unfortunately, insurance that did not cover black mold. Even if the representation regarding Mrs. Moore's father's being an investor in Moore Pizazz were found to be false, Plaintiffs have not established that their reliance was justifiable.[25] Justifiable reliance is judged by whether the creditor acted appropriately in the particular circumstances of the case.[26] In this case, Plaintiffs testified that they had serious reservations about Moore Pizazz's ability to perform due to prior performance issues and the large amount of the required deposits. Although Plaintiffs testified that their concerns were assuaged by Mrs. Moore's statements that her father financially backed the business and that the business was insured, they did nothing to confirm that Mrs. Moore's father would back-stop his daughter or to verify the scope of the insurance

---

[23] *In re Wood*, 245 F. App'x 916, 917-18 (11th Cir. 2007).
[24] *In re Daprizio*, 365 B.R. 268, 280 (Bankr. S.D. Fla. 2007) (finding that plaintiff's claim failed because there was "no evidence that at the time of the inception of the loan or at the renewals that there was any false pretenses, a false representation, or actual fraud that was relied upon by [p]laintiff").
[25] *Field v. Mans*, 516 U.S. 59, 73-75 (1995) (holding that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance) (citing *In re Vann*, 67 F.3d 277, 281 (11th Cir. 1995)).
[26] *In re Vann*, 67 F.3d at 284.

coverage. Yet, despite their own misgivings and lack of confirmation of anything she told them, Plaintiffs delivered an additional $30,000.00 to Moore Pizazz. The Court finds that given the parties' prior contractual dealings, Plaintiffs' reliance was not justifiable.

### *Count III as to Jennifer Moore: Conversion Under § 523(a)(6)*

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[27] Plaintiffs allege that Mrs. Moore willfully and maliciously injured them by committing the tort of conversion when she misappropriated for her own use over $42,000.00 of Plaintiffs' property – in the form of cash deposits and whatever corresponding goods were purchased with those deposits. Willful and malicious injury includes willful and malicious conversion, which courts have defined as "the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights."[28] In other words, Plaintiffs argue that the deposits that they advanced to Moore Pizazz, together with any goods that were purchased with those deposits, remained their property, and that Mrs. Moore's alleged use of those deposits and goods for any purpose other than to fulfill Plaintiffs' orders constitutes conversion.

However, Plaintiffs' contract with Moore Pizazz did not expressly state that the deposits would remain Plaintiffs' property. In *National Tour Association, Inc. v. Rodriguez*,[29] the plaintiff asserted a similar conversion theory, but the court found that the defendant's use of customer deposits to pay for general business expenses did not constitute conversion because there was no evidence that the defendant had represented to the customers that their deposits would remain the customers' property. The court rejected the plaintiff's argument that the defendant was acting as an agent or bailee for the customers by holding their deposits on their behalf, and concluded that the

---

[27] § 523(a)(6).
[28] *In re Wolfson*, 56 F.3d 52, 54 (11th Cir. 1995).
[29] 221 B.R. 1012, 1014 (Bankr. M.D. Fla. 1998).

defendant had not committed conversion by depositing the customer deposits into her business's general account and then using those funds to pay for general business expenses.[30]

As in *Rodriguez*, there is no evidence that Mrs. Moore was Plaintiffs' agent, such that Plaintiffs' deposits remained their property and that Mrs. Moore was prohibited from using the deposits to pay for Moore Pizazz's general business expenses. The Engagement Letter did not provide that their deposits would be segregated or that Moore Pizazz would be restricted with its use of their deposits. There was no evidence that Mrs. Moore used Plaintiffs' deposits for anything other than Moore Pizazz's business expenses. Accordingly, the Court finds that Plaintiffs have not met their burden of proof on this issue.

### *Count V as to Robert Moore: Conversion Under § 523(a)(6)*

Plaintiffs alleged that Mr. Moore converted for his own use "$42,443.68 and/or goods purchased that was then" their property.[31] In order to prevail on a claim for conversion under § 523(a)(6), Plaintiffs must prove that Mr. Moore engaged in the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights.[32] In other words, Plaintiffs must prove that they owned the goods that Mr. Moore sold under consignment to Posh Plum. There was no evidence that Plaintiffs owned any of the goods that Mr. Moore consigned to Posh Plum or that they owned any of the Moore Pizazz assets that were sold.

However, because courts have recognized that a true ownership right is not necessary to support a cause of action for conversion, the question arises whether Plaintiffs' claim and judgment against Moore Pizazz arise to the level of "ownership" necessary to state a claim for conversion. For example, a lienholder is considered to be an "owner" for purposes of a conversion claim if the

---

[30] *Id.* at 1017.
[31] Doc. No. 40, ¶ 62.
[32] *In re Wolfson*, 56 F.3d at 54.

lienholder has a present right of possession to the property in question.[33] Other courts also acknowledge that a possessory right is sufficient to confer standing on a plaintiff to file suit for conversion.[34] For judgment holders like Plaintiffs, such a possessory right could arise either by a valid judgment lien or pursuant to a writ of execution.

However, there was no evidence at trial that Plaintiffs held a valid, perfected judgment lien encumbering Moore Pizazz's property or that Plaintiffs had obtained a writ of execution that they delivered to the local county sheriff's office, together with the corresponding instructions for levy and any required cost deposit, to effectuate a levy on Moore Pizazz's property.[35] Thus, Plaintiffs did not meet their burden of proof on their specific claim for conversion. Plaintiffs' claim against Mr. Moore is not excepted from discharge under § 523(a)(6).

*Count VI as to Jennifer and Robert Moore: Civil Conspiracy to Commit Conversion Under § 523(a)(6)*

Plaintiffs allege that Defendants conspired to use Plaintiffs' deposits for their own use, including using their deposits to obtain new office space instead of purchasing goods to fulfill Plaintiffs' orders.[36] To establish a claim for civil conspiracy to convert, a plaintiff must establish the underlying intentional tort. The conspiracy by itself is insufficient.[37] As discussed above, Plaintiffs have not established an underlying conversion because there was no evidence that Mrs. Moore was prohibited from depositing Plaintiffs' deposits into Moore Pizazz's general operating account and

---

[33] *Bel-Bel Intern. Corp. v. Community Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998).
[34] *Matter of Dino*, 17 B.R. 316, 318 (Bankr. M.D. Fla. 1982); *Spec. Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1102 (S.D. Fla. 2000) ("All that a plaintiff must show is a right of possession."); *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th Dist. Ct. App. 1980) ("In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present or immediate right of possession of the property in question.").
[35] Fla. Stat. §§ 30.30(1)(a); 56.021.
[36] Doc. No. 40, ¶ 67.
[37] *In re Nofziger*, 361 B.R. 236, 243 (Bankr. M.D. Fla. 2006).

then using those funds to pay for general business expenses. Thus, Plaintiffs cannot establish the underlying requisite tort to support this non-dischargeability claim.

## CONCLUSION

The Court recognizes that Plaintiffs suffered a significant financial loss when Moore Pizazz breached the parties' contract by failing to complete Plaintiffs' design project for which they had paid a significant deposit. But the issues raised in this adversary proceeding are whether Plaintiffs' judgment against Mrs. Moore should be excepted from discharge under § 523(a)(2); whether Plaintiffs' claims for conversion of their property and conspiracy to convert their property should be excepted from discharge under § 523(a)(6); whether Defendants' discharges should be barred because of their failure to make full disclosure on their bankruptcy schedules and statement of financial affairs under § 727(a)(4)(A); and whether Mrs. Moore's discharge should be barred for failure to explain a loss of assets under § 727(a)(5).

For the reasons set forth above, the Court concludes that Plaintiffs have not met their burden of proof on these claims. Plaintiffs' claims are not excepted from discharge, and Defendants' discharge shall not be barred. The Court will enter a separate judgment in favor of Defendants.

Dated: __April 16, 2014_____.

_____
Caryl E. Delano
United States Bankruptcy Judge

Attorney Alan Hamisch is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.